IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
AT CLARKSBURG

WEST VIRGINIA HIGHLANDS
CONSERVANCY, COand
SIERRA CLUB

      Plaintiffs,

v.                                        CIVIL ACTION NO. 1:12-00025

CORESCO, LLC and
MEPCO, LLC

      Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND FOR CIVIL PENALTIES

## INTRODUCTION

1.    This is a citizen suit for declaratory and injunctive relief and civil penalties against Coresco, LLC ("Coresco") for violations of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq. ("the Clean Water Act" or "CWA"), and the Surface Mining Reclamation and Control Act, 30 U.S.C. § 1201 et seq. ("SMCRA") at Coresco's Refuse Disposal Areas Nos. 2 and 3 and the Crafts Run Refuse disposal Area (collectively "Coresco Refuse Disposal Areas") all near Maidsville in Monongalia County, West Virginia.

2.    This suit also seeks declaratory and injunctive relief and civil penalties for violations of the CWA by Mepco, LLC ("Mepco") at its property near Maidsville at or adjacent to the Coresco Refuse Disposal Areas.

3.    As described below, Plaintiffs allege that Coresco and Mepco have discharged and continue to discharge pollutants into waters of the United States in violation of Section 301 of the Clean Water Act, 33 U.S.C. § 1311, and of the conditions and limitations of West

Virginia/National Pollution Discharge Eliminations System ("WV/NPDES") Permits issued to Coresco pursuant to Section 402 of the Clean Water Act.

4. Plaintiffs further allege that Coresco's discharge of unlawful quantities of pollutants into waters adjacent to the Coresco Refuse Disposal Areas violate the performance standards under SMCRA and the terms and conditions of Coresco's surface mining permits.

## JURISDICTION AND VENUE

5. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 33 U.S.C. § 1365 (CWA citizens' suit provision), and 30 U.S.C. § 1270 (SMCRA citizens' suit provision).

6. On October 17, 2011 Plaintiffs gave notice of the violations and their intent to file suit against defendants to the United States Environmental Protection Agency ("EPA"), the Office of Surface Mining Reclamation and Enforcement ("OSMRE"), and the West Virginia Department of Environmental Protection ("WVDEP"), as required by Section 505(b)(1)(A) of the CWA, 33 U.S.C § 1365(b)(1)(A), and Section 520(b)(1)(A) of SMCRA, 30 U.S.C. § 1270(b)(1)(A).

7. More than sixty days have passed since notice was sent.  EPA, OSMRE, and/or WVDEP have not commenced nor diligently prosecuted a civil or criminal action to redress the violations.  Moreover, neither EPA nor WVDEP commenced an administrative penalty action under Section 309(g) of the CWA, 33 U.S.C. § 319(g), or a comparable state law to redress the violations prior to the issuance of the October 17, 2011 notice letter.

8. Venue in this district is proper pursuant to 33 U.S.C. § 1365(c)(1) because the source of the Clean Water Act violations is located in this District, and pursuant to 30 U.S.C. § 1270(c) because the coal mining operations complained of are in this District.

## PARTIES

9. Coresco is a West Virginia Limited Liability Company engaged in the business of processing coal and disposing of coal and coal-ash waste.

10. Mepco is a West Virginia Limited Liability Company which owns the land upon which Coresco's operations are conducted and upon which pollution is discharged from unpermitted point sources into waters of the United States.

11. Both Coresco and Mepco are persons within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5), and Section 701(19) of SMCRA, 30 U.S.C. § 1291(19).

12. Since at least the year 2000, Coresco has operated, and continues to operate, various Coresco Refuse Disposal Areas in Monongalia County, West Virginia near the town of Maidsville. Refuse Disposal Area No. 2 is regulated by SMCRA permit O-63-83 and WV/NPDES Permit WV1002619. Refuse Disposal Area No. 3 is regulated by SMCRA permit O-1015-93 and WV/NPDES permit WV1002619. The Crafts Run Refuse Disposal area is regulated by SMCRA Permit O-1012-97 and WV/NPDES Permit WV1017314, except for the discharge from sediment pond 002, which is regulated by WV/NPDES Permit WV1002619. Each of these areas discharges into Crafts Run, a tributary of the Monongahela River.

13. At all relevant times, Mepco has owned, and continues to own, the land upon which Coresco operations are conducted and upon which two Seeps – Pittsburgh Seep 2 and Pittsburg Seep 3 – are located. These seeps each discharge into Crafts Run.

14. Plaintiff West Virginia Highlands Conservancy, Inc. ("WVHC") is a nonprofit organization incorporated in West Virginia. It has approximately 2,000 members. It works for the conservation and wise management of West Virginia's natural resources.

15. Plaintiff Sierra Club is a nonprofit corporation incorporated in California, with more than 600,000 members and supporters nationwide and approximately 1,900 members who reside in West Virginia and belong to its West Virginia Chapter. The Sierra Club is dedicated to exploring, enjoying and protecting the wild places of the Earth; to practicing and promoting the responsible use of Earth's resources and ecosystems; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. The Sierra Club's concerns encompass the exploration, enjoyment, and protection of surface waters in West Virginia.

16. Plaintiffs have members who use, enjoy, and benefit from the water quality in Crafts Run, Robinson Run, their tributaries, and associated natural resources. They would like to recreate in the areas downstream from Coresco's operations and Mepco's discharges, but excessive amounts of pollutants harmful to the aquatic ecosystem make the water aesthetically unpleasant and environmentally undesirable. Crafts Run particularly is biologically impaired and unsuitable for a full diversity of aquatic life. Because of this Plaintiffs' members refrain from or restrict some of their usage of Crafts Run and Robinson Run. As a result the environmental, health, aesthetic and recreational interests of these members are adversely affected by Coresco's and Mepco's discharges of pollutants into Crafts Run and its tributaries. If Coresco's and Mepco's unlawful discharges ceased, the harm to the interests of Plaintiff's members would be redressed.

    a. For example, member John Wood has been visiting Crafts Run since 1992. He found the stream while driving backroads near his home and now goes there regularly on route to Pennsylvania. He is bothered by the obvious impacts to the stream – in the form of orange staining from acid mine

        drainage. He is even more concerned, however, by the less visually obvious impacts from ionic pollution and other constituents of coal-ash. He fears that through their activities Coresco and Mepco are killing the wildlife in Crafts Run through their discharges. He will continue to visit Crafts Run but would enjoy these visits much more if he knew that Coresco and Mepco were not actively degrading the stream.

    b. Another member, Jarrett Jamison grew up approximately ¼ to ½ mile from Crafts Run and still lives on his family's property there. He has seen the quality of the stream grow worse over time. He used to let his dogs run around near Crafts Run, but no longer does so because he fears what might happen to them if they drink the water. He is also worried about the impacts of the stream not only on aquatic life but on other animals that depend upon it for drinking water. While he used to see wildlife in the watershed often he seldom does any more. Mr. Jamison frequently visits Crafts Run and will continue to do so, but would enjoy his visits more if he knew Mepco and Coresco were complying with the law. He also believes that his family property would be more valuable if Coresco and Mepco were not discharging pollutants above the levels allowed by law.

17. At all relevant times, Plaintiffs were and are persons as the term is defined by the CWA, 33 U.S.C. § 1362(5), and SMCRA, 30 U.S.C. § 1291(19).

## STATUTORY AND REGULATORY FRAMEWORK

18. Section 301(a) of the CWA, 33 U.S.C. § 1311, prohibits the "discharge of any pollutant by any person" into waters of the United States except in compliance with the terms of

a permit, such as an NPDES permit issued by the EPA or an authorized state pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

19. Section 402(a) of the CWA, 33 U.S.C. § 1342(a), provides that the permit issuing authority may issue an NPDES Permit that authorizes the discharge of any pollutant directly into waters of the United States, upon the condition that such discharge will meet all applicable requirements of the CWA and such other conditions as the permitting authority determines necessary to carry out the provisions of the CWA.

20. Section 303(a) of the CWA, 33 U.S.C. § 1313(a), requires that states adopt ambient water quality standards and establish water quality criteria for particular water bodies that will protect the designated uses of the water.

21. The Administrator of EPA authorized WVDEP, pursuant to Section 402(a)(2) of the CWA, 33 U.S.C. § 1342(a)(2), to issue NPDES permits on May 10, 1982. 47 Fed. Reg. 22363. The applicable West Virginia law for issuing NPDES permits is the West Virginia Water Pollution Control Act ("WPCA"), W.Va. Code § 22-11-1, et seq.

22. Section 505(a) of the CWA, 33 U.S.C. § 1365(a), authorizes any "citizen" to "commence a civil action on his own behalf . . . against any person . . . who is alleged to be in violation of . . . an effluent standard or limitation under this chapter."

23. Section 505(f) of the CWA, 33 U.S.C. § 1365(f), defines an "effluent standard or limitation under this chapter," for purposes of the citizen suit provision of section 505(a) of the CWA § 1365(a), to mean, among other things, an unlawful act under Section 301(a), 33 U.S.C. § 1311(a), of the CWA and "a permit or condition thereof issued" under Section 402, 33 U.S.C. § 1342, of the CWA.

24. In an action brought under Section 505(a) of the CWA, 33 U.S.C. § 1365(a), the district court has jurisdiction to order the defendant or defendants to comply with the CWA and to assess civil penalties under Section 309(d) of the CWA, 33 U.S.C. § 1319(d).

25. Section 309(d) of the CWA, 33 U.S.C. § 1319(d), provides that any person who violates Section 301 of the CWA, 33 U.S.C. § 1311, or violates any permit condition or limitation in a permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, shall be subject to a civil penalty payable to the United States of up to $25,000 per day for each violation.

26. Pursuant to the Federal Civil Penalties Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, the court may assess a civil penalty of $37,500 per day for each violation that occurred after January 12, 2009. *See* 40 C.F.R. § 19.4.

27. Under Section 505(d) of the CWA, 33 U.S.C. § 1365(d), the court "may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such an award is appropriate."

28. Section 506 of SMCRA, 30 U.S.C. § 1256, prohibits any person from engaging in or carrying out surface coal mining operations without first obtaining a permit from the OSMRE or from an approved state authority.

29. At all relevant times, the State of West Virginia has administered an approved surface mining regulatory program under SMCRA. *See* 30 C.F.R. § 948.10.

30. Among the performance standards mandated by SMCRA and the West Virginia Surface Coal Mining and Reclamation Act ("WVSCMRA") is that "[d]ischarge from areas disturbed by . . . mining shall not violate effluent limitations or cause a violation of applicable water quality standards." 38 C.S.R. § 2-14.5.b.; *see also,* 30 C.F.R. §§ 816.42 and 817.42;

31. The performance standards also require that "[a]ll surface mining and reclamation activities shall be conducted . . . to prevent material damage to the hydrologic balance outside the permit area." 38 C.S.R. § 2-14.5.; *see also,* 30 C.F.R. §§ 816.41 and 817.41.

32. The legislative rules promulgated under the WVSCMRA provide that, as a general condition of all surface mining permits issued under the WVSCMRA, the permittee must comply with all applicable performance standards. 38 C.S.R. § 2-3.33.c.

33. Section 520(a) of SMCRA, 30 U.S.C. § 1270(a), authorizes any person adversely affected to bring an action in federal court to compel compliance with SMCRA against any "person who is alleged to be in violation of any rule, regulation, order or permit issued pursuant to [SMCRA]."

34. Section 520(d) of SMCRA, 30 U.S.C. § 1270(d), authorizes the Court to award the costs of litigation, including attorneys' fees and expert witness fees, "to any party whenever the court determines such an award is appropriate."

35. WVDEP is the agency in the State of West Virginia that administers that State's CWA and SMCRA programs and issues WV/NPDES Permits and WVSCMRA Permits.

**FACTS**

36. Coresco holds at least three surface mining permits for operations on Mepco property in the Crafts Run Watershed. While this area has been extensively mined in the past, each of the currently operable surface mining permits is principally for the purpose of coal waste disposal (both coal processing waste and coal-ash waste from area power plants). Permit O-62-83 was issued on April 20, 1983 and currently encompasses 13.62 acres for Refuse Disposal Area No. 2 on the east side of Crafts Run. Permit O-1015-93 was issued on August 12, 1996 for Refuse Disposal Area No. 3 and currently encompasses 140.32 acres, adjacent to Area No. 2 to

the east of Crafts Run.  Permit O-1012-97 was issued on October 13, 2000 for the Crafts Run Refuse Disposal area and currently encompasses 250 acres to the west of Crafts Run.

37. Pursuant to EPA's delegation of authority and the WPCA, WVDEP issued WV/NPDES Permit WV1002619 to Coresco on November 25, 1986.  This permit covers discharges from Coresco's Refuse Disposal Areas No. 2 and 3 and from outlet 002 of the Crafts Run Refuse Disposal Area.  The WVDEP issued WV/NPDES Permit WV1017314 to Coresco on April 14, 2000.  This permit covers all of the other outlets on the Crafts Run Refuse Disposal Area.  Each of these permits regulates discharges from the Coreco operations into Crafts Run.

38. At least two seeps are located on or near Coresco operations on land owned by Mepco.  Pittsburgh Seep 3 ("Seep 3") is just south of Refuse Disposal Area No. 3 and is located within a few hundred feet of outlet 003 of WV/NPDES Permit WV1002619.  Coresco takes water quality samples from this discharge as a groundwater monitoring site pursuant to WV/NPDES Permit WV1002619.  Another seep, Pittsburgh Seep 2 ("Seep 2") is located next to Crafts Run on Mepco property approximately one-half mile downstream from the Coresco Refuse Disposal Area No. 3.  Each of these seeps is a point source discharge which contributes pollution to the waters of the United States.

39. Both WV/NPDES Permit WV1002619 and WV/NPDES Permit WV1017314 incorporate by reference 47 C.S.R. § 30-5.1(f), which provides that "[t]he discharge or discharges covered by a WV/NPDES permit are to be of such quality so as not to cause a violation of applicable water quality standards adopted by the Department of Environmental Protection, Title 47, Series 2."

40. West Virginia's narrative water quality standards in Title 47 prohibit the discharge of "[m]aterials in concentrations which are harmful, hazardous or toxic to man, animal

or aquatic life" or that "cause" or "materially contribute to. . . significant adverse impacts to the chemical physical, hydrologic, or biological components of aquatic ecosystems." 47 C.S.R. §§ 2-3.2.e & 2-3.2.i.

41. Benthic surveys conducted on Crafts Run show that the stream is biologically impaired. WVDEP's August 12, 2010 "Justification and Background for Permitting Guidance on Surface Coal Mining Operations to Protect West Virginia's Narrative Water Quality Standards, 47 C.S.R. 2 §§ 3.2.e and 3.2.i" ("Narrative Standard Guidance"), states that "the current WVSCI [West Virginia Stream Condition Index] score that indicates the integrity of a benthic macroinvertebrate community in West Virginia's wadeable streams is 68.0." Benthic macroinvertebrate surveys conducted for Coresco on November 7, 2008 and included in a June 4, 2009 permit modification to Permit WV1002619 show WVSCI scores significantly below this 68.0 threshold. At CR-2, just below discharge 002 of WV/NPDES Permit WV1002619, the WVSCI score was 36. At CR-3, near the confluence of the northern and eastern fork of Crafts Run, the WVSCI score was 49. Further downstream at site CR-4, located near Seep 2, the WVSCI score was 57.

42. A recent EPA guidance document provides that "high levels of salts, measured as TDS or conductivity, are a primary cause of water quality impairments downstream from mine discharges." EPA, July 21, 2011 Memorandum re: Improving Review of Appalachian Surface Coal Mining Operations under the Clean Water Act, National Environmental Policy Act, and the Environmental Justice Executive Order, Appendix 1, p. ii. Sulfates are one of those salts associated with high conductivity. *Id.* EPA also found that "substantial and increasing aquatic life impacts occur as conductivity increases beyond 300 μS/cm" and that in-stream conductivity

levels above 500 µS/cm are "likely to result in substantial aquatic life effects." Mem., p. 16 and Appendix 1, p. iv.

    43. In WVDEP's Narrative Standard Guidance, the agency provides ranges at which it believes ionic pollution is likely to cause or contribute to biological impairment in streams. WVDEP considers conductivity to be a "definite stressor" when it exceeds 1533 µS/cm and a "likely stressor" when it exceeds 1075 µS/cm. In the same document, WVDEP considers sulfate to be a "definite stressor" when it exceeds 417 mg/l and a "likely stressor" when it exceeds 290 mg/l.

    44. Water quality samples in Crafts Run and its tributaries show ionic pollution consistently above the "definite stressor" level recognized by the WVDEP, and far in excess of the thresholds contained within EPA guidance. For example, conductivity at the three benthic macroinvertebrate sites, taken the same day as biological samples, was 3,170 µS/cm, 1,910 µS/cm, and 2,640 µS/cm at sites CR-2, CR-3 and CR-4, respectively. Sulfate was measured in concentrations of 1,664 mg/l, 666 mg/l, and 1,224 mg/l at those sites, respectively.

    45. Coresco's own monitoring data on Crafts Run likewise supports the conclusion that high levels of ionic pollutant discharges are harming Crafts Run and that the concentrations of these pollutants increase as the stream flows through Mepco property and past the Coresco Refuse Disposal Area.

    a. At BWQ 2, which is on the north fork of Crafts Run and carries discharges from Refuse Disposal Area 3, Coresco took samples on 2/12/2008, 2/25/2008, 3/7/2008, 3/24/2008, 4/8/2008, 4/18/2008, 5/6/2008, 5/30/2008, 6/10/2008, 6/20/2008, and 7/16/2008. All results were above WVDEP's 1533 µS/cm definite stressor threshold except the reading on 2/12/2008, which was just below at 1478 µS/cm. At BWQ 3,

which is close to CR-2, readings were taken on the same dates and the results ranged from 656 µS/cm to 1005 µS/cm.

    b. Downstream, at sampling point DCR-2 of permit WV1002619, measurements taken on 11/30/2009, 12/31/2009, 1/31/2010, 5/31/2010, 6/30/2010, 7/31/2010, 8/31/2010, 9/30/2010, 11/30/2010, 12/31/2010, 2/28/2010, 3/31/2010, 4/30/2010, 10/31/2010 show that TDS concentrations varied from approximately 1300 mg/L to 2600 mg/L. This monitoring point is just below the location where outlets from Refuse Disposal Area 3 and the Crafts Run Disposal Area enter Crafts Run, and also where Seep 3 discharges into Crafts Run. In general, conductivity readings are around 1.4 times higher than TDS readings so all of these samples indicate that ionic pollution is a definite stressor at this point.

    c. The same pattern is also evident with sulfate. Samples taken on 11/30/2009, 12/31/2009, 1/31/2010, 5/31/2010, 6/30/2010, 7/31/2010, 8/31/2010, 9/30/2010, 11/30/2010, 12/31/2010, 2/28/2010, 3/31/2010, 4/30/2010, and 10/31/2010 show that sulfate levels at DCR-2 of WV/NPDES Permit WV1002619 ranged from 1,000 mg/L to 2,200 mg/L. These levels are well above the 417 mg/L level at which WVDEP considers sulfate to be a definite stressor.

    d. The pollutant loads evident in Crafts run must be coming from the Coresco operations and/or Mepco property because there are no other significant discharges in the watershed and company data show that the headwaters of the stream are low in conductivity, TDS, and sulfates. In-stream sampling point UCR-1 of WV/NPDES Permit WV1002619 (located upstream of Coresco's operations and the unpermitted seeps) showed conductivity ranged between 180 µS/cm and 391 µS/cm in older data taken

between 1985 and 1993.  Similarly, TDS concentrations ranged from 130 mg/L to 460 mg/L when sampled on various dates between 12/31/2009 and 4/30/2010.  UCR-1 samples for sulfates taken on 11/30/2009, 12/31/2009, 1/31/2010, 5/31/2010, 6/30/2010, 7/31/2010, 8/31/2010, 9/30/2010, 11/30/2010, 12/31/2010, 2/28/2010, 3/31/2010, 4/30/2010, and 10/31/2010 show sulfate concentrations ranging from non-detectable levels to 120 mg/l.

46. To confirm this trend of increasing pollution as Crafts Run flows through Coresco operation and Mepco property, Plaintiffs' counsel retained a consulting firm, Downstream Strategies, to take water quality samples on September 8, 2011.  The conductivity level at the uppermost monitoring location was 338 µS/cm.  This increased to 1,420 µS/cm at a sampling point just downstream of Seep 2, close to location CR-4, and was 1,350 µS/cm at the mouth of Crafts Run.  Similarly, the TDS concentration in the upper reaches of Crafts Run (prior to the point it flows past Coresco's refuse disposal areas) was measured at 175 mg/L.  After passing through Mepco's property and Coresco's operations, levels were elevated to 1,040 mg/L.  Sulfate levels also followed the same pattern as TDS and conductivity.  Downstream Strategies' sampling reveals sulfates at 42 mg/L at the uppermost sampling point, 642 mg/L at the location below Seep 2 and 660 mg/L at the mouth of Crafts Run.

47. Coresco's operations cause or materially contribute to the observed ionic pollution in Crafts Run.  Discharge monitoring reports related to WV/NPDES Permits WV1002619 and WV1017134 show substantial levels of TDS and sulfates, above levels considered harmful to aquatic life, being discharged from several outlets permitted to Coresco.

    a.  Samples taken at outlet 001 of WV/NPDES Permit WV1002619 on 2/28/2010, 3/31/2010, 4/30/2010, and 10/31/2010 show TDS levels ranging from 1196 mg/L to 3108 mg/L and sulfate levels ranging from 900 mg/L to 1250 mg/L.

    b.  Samples taken at outlet 002 of permit WV1002619 on 1/31/2010, 5/31/2010, 6/30/2010, 12/31/2010, 2/28/2010, 3/31/2010, and 10/31/2010 show TDS levels ranging from 424 mg/L to 1008 mg/L and sulfate levels ranging from 240 mg/L to 650 mg/L.  A sample taken at outlet 003 of WVNPDES Permit WV1002619 on 3/31/2010 shows a TDS level of 1620 mg/L and a sulfate level of 1200 mg/L.  A sample taken at outlet 002 of WV1017314 on 2/28/2011 shows a TDS level of 484 mg/L and a sulfate level of 247 mg/L.

48.    In addition to ionic pollution, Coresco has discharged several other pollutants in violation of applicable West Virginia Water Quality Standards.

    a.  On 3/31/2010 outfalls 001 and 002 of WV1002619 discharged selenium at 5.73 µg/L and 8.27 µg/L respectively.  On 3/31/2008 outfall 001 of WV1002619 discharged selenium at 6.44 µg/L.  These concentrations are excess of state water quality standards for warm water fisheries of 5.0 µg/L.

    b.  On 3/31/2008 outfall 001 of WV1002619 discharged arsenic at 11.04 µg/L, which exceeds the state water quality standard for arsenic of 10 µg/L.  The arsenic standard was also exceeded at sampling point DCR2 associated with permit WV1017314, where the measured arsenic concentration was 18.2 µg/L.

49.    Mepco is responsible for unpermitted discharges of pollutants into Crafts Run from Seep 2 and Seep 3.

a. Samples taken on 5/31/2010, 9/30/2010, 11/30/2010, and 3/31/2010 from Seep 3, which is slightly downstream from outlet 003 of permit WV1002619, show TDS levels consistently above 1500 mg/L, and sulfate levels ranging from 1150 mg/L to 1650 mg/L.

b. Further downstream, close to CR-4, Seep 2 discharges into Crafts Run. Sampling by Downstream Strategies shows Seep 2 was discharging TDS at 2160 mg/L and sulfates at 1290 mg/L on September 8, 2011.

c. The West Virginia Water Quality Criteria are 1.5 mg/L for iron and 1.0 mg/L for manganese. Coresco water quality samples from CR-4, near Seep 2, taken on November 7, 2008, show dissolved iron at a concentration of 2.6 mg/L and manganese at 2.30 mg/L. Sampling on the same day above Coresco operations and Seeps 2 and 3 did not show detectable levels of these pollutants. Downstream Strategies' sampling of Seep 2 showed discharges of iron at 56.1 mg/L and manganese at 2.02mg/L. Just downstream from Seep 2, Downstream Strategies measured iron levels of 7.94 mg/L and manganese levels of 1.29 mg.

d. West Virginia water quality standards mandate that pH levels be maintained between 6.0 and 9.0. Downstream Strategies' sampling revealed that Seep 2 was discharging effluent at a pH of 2.6.

e. Finally, Downstream Strategies' sampling showed beryllium levels at 3.5 µg/L at this seep and 1.7 µg/L at the mouth of Crafts Run. These beryllium levels exceed the state water quality standards for public water supply.

**FIRST CLAIM FOR RELIEF**

**(Coresco Clean Water Act Violations)**

50. Plaintiffs incorporate by reference all allegations contained in paragraphs 1 through 49 *supra.*

51. Since at least February 2008, Coresco has discharged pollutants from its Refuse Disposal Areas through point sources into Crafts Run and its tributaries pursuant to WV/NPDES Permits WV1002619 and WV1017314.

52. Crafts Run and its tributaries are waters of the United States within the meaning of 33 U.S.C. § 1362(7).

53. Since at least February 2008, Coresco has discharged and continues to discharge pollutants which are above applicable water quality standards and which lead to ionic stress and/or biological impairment in Crafts Run in violation of West Virginia's narrative water quality standards for biological integrity and aquatic life protection. 47 C.S.R. §§ 2-3.2.e. & 2-3.2.i.

54. Coresco has additionally discharged other pollutants in violation of specific water quality criteria adopted by the state of West Virginia for aquatic life protection and protection of human health. *See* 47 C.S.R. § 2 Appx. E Table 1.

55. Water quality standards, including the narrative standards for biological integrity and aquatic life protection, are incorporated by reference into Coresco's WV/NPDES Permits WV1002619 and WV1017314. Those standards are, therefore, "effluent standards or limitations" for purposes of Sections 505(a)(1) and 505(f)(6) of the Clean Water Act because they are conditions of a permit issued under section 402 of the Act. 33 U.S.C. § 1342, 1365(a)(1), 1365(f)(6).

56. Based on WVSCI scores, and measured concentrations of specific pollutants in Crafts Run and in discharges from Coresco's operations, and Coresco's failure to take corrective

actions to address those conditions, Plaintiffs believe that Coresco is in continuing and/or intermittent violation of WV/NPDES permits WV1002619 and WV1017314.

57.     Pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365, Coresco is liable for civil penalties up to $37,500 per day of violation for its violations of effluent limits in WV/NPDES Permits WV1002619 and WV1017314.

58.     Coresco is subject to an injunction under the CWA ordering it to cease its permit violations.

## SECOND CLAIM FOR RELIEF

### (Mepco Unpermitted Discharge Violations)

59.     Plaintiffs incorporate by reference all allegations contained in paragraphs 1 through 58 *supra.*

60.     Since at least May 2010, Mepco has been discharging pollutants from Seep 3 into Crafts Run and its tributaries, including several pollutants in concentrations above applicable West Virginia Water Quality Standards.

61.     Neither Mepco nor any other entity holds a valid permit for the discharge of pollutants from Seep 3.

62.     Since at least September 8, 2011, Mepco has been discharging pollutants from Seep 2, including several pollutants in concentrations above applicable West Virginia Water Quality Standards.

63.     Neither Mepco nor any other entity holds a valid permit for the discharge of pollutants from Seep 2.

64.     Seep 2 and Seep 3 are each point sources pursuant to the Clean Water Act.  33 U.S.C. § 1362(14).

65. Because of these unpermitted discharged, Mepco is in violation of the Clean Water Act's prohibition on the discharges of pollutants without a permit. 33 U.S.C § 1311. This prohibition is enforceable pursuant to 33 U.S.C. §§ 1365(a)(1), 1365(f)(2).

66. Upon information and belief, Plaintiffs believe that Mepco is in continuing and or/intermittent violation of the prohibition on the discharge of pollutants from a point source without a permit.

67. Pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. § 1319(d) and 1365, Mepco is liable for civil penalties of up to $37,500 per day for its unpermitted discharges.

68. Mepco is also subject to an injunction under the CWA ordering it to cease its unpermitted discharges.

## THIRD CLAIM FOR RELIEF

### (Coresco's SMCRA Violations)

69. Plaintiffs incorporate by reference all allegations contained in paragraphs 1 through 69 *supra*.

70. Each of Coresco's WVSCMRA Permits, O-1015-93, O-63-83, and O-1012-97, require it to comply with performance standards of the WVSCMRA. 38 C.S.R. § 2-3.33(c).

71. Those standards provide that "discharge from areas disturbed by surface mining shall not violate effluent limitations or cause a violation of applicable water quality standards." 38 C.S.R. § 2-14.5.b.

72. WVSCMRA performance standards also provide that "[a]ll surface mining and reclamation activities shall be conducted . . . to prevent material damage to the hydrologic balance outside the permit area." 38 C.S.R. § 2-14.5. "Material damage," includes the violations of water quality standards leading to biological degradation of the aquatic ecosystem.

73.     By violating West Virginia Water Quality Standards at its Refuse Disposal Areas Coresco has violated and continues to violate the performance standards incorporated into permits O-63-83, O-1015-93, and O-1012-97.

74.     Each violation of Coresco's WVSMCRA permits is a violation of SMCRA and is enforceable under the citizen suit provision of SMCRA, 30 U.S.C. § 1270(a).

75.     Coresco is subject to an injunction under SMCRA ordering it to cease its permit violations.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Court enter an Order:

1.      Declaring that Coresco has violated and continues to violate the Clean Water Act and SMCRA;

2.      Declaring that Mepco has violated and continues to violate the Clean Water Act;

3.      Enjoining Coresco from operating its facilities in such a manner as will result in further violations of the effluent limits in WV/NPDES Permits WV1002619 and WV1017314;

4.      Enjoining Mepco from discharging pollutants without a Clean Water Act permit from Seeps 2 and 3;

5.      Ordering Coresco to immediately comply with effluent limitations in WV/NPDES Permits WV1002619 and WV1017314;

6.      Ordering Coresco to immediately comply with the terms and conditions of WVSCMRA Permit Numbers O-63-83, O-1015-93, and O-1012-97;

7.      Ordering Coresco to pay appropriate civil penalties up to $37,500 per day for each CWA violation;

8. Ordering Mepco to pay appropriate civil penalties up to $37,500 per day for each CWA violation;

9. Ordering Coresco and/or Mepco to conduct monitoring and sampling to determine the environmental impacts of their violations, to remedy and repair environmental contamination and/or degradation caused by the above-listed violations, and restore the environment to its prior uncontaminated condition;

10. Awarding Plaintiffs their attorneys' and expert witness fees and all other reasonable expenses incurred in pursuit of this action; and

11. Granting other such relief as the Court deems just and appropriate.

Respectfully submitted,

/s/ J. Michael Becher
J. Michael Becher W.Va. Bar No. 10588
Joseph M. Lovett W.Va. Bar No. 6926
Appalachian Mountain Advocates
PO Box 507
Lewisburg, WV 24901
(304) 382-4798
mbecher@appalmad.org

Counsel for:

The Sierra Club
85 Second Street, 2d Floor
San Francisco, CA 94105-3441
(415) 977-5680

West Virginia Highlands Conservancy
P.O. Box 306
Charleston, WV 25321
(304) 924-5802